IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| DEBORAH BROWN, | ) | |
| | ) | |
| Plaintiff, | ) | No. 4:13-CV-01151-BCW |
| | ) | March 5, 2015 |
| v. | ) | Kansas City, Missouri |
| | ) | CIVIL |
| ALLY FINANCIAL INC., | ) | |
| | ) | |
| Defendant. | ) | |

DISCOVERY DISPUTE TRANSCRIPT
BEFORE THE HONORABLE BRIAN C. WIMES
UNITED STATES DISTRICT JUDGE

Proceedings recorded by electronic voice writing
Transcript produced by computer

APPEARANCES

For Plaintiff: MR. ROBERT HORN
MR. JOSEPH KRONAWITTER
Horn, Aylward & Bandy, LLC
2600 Grand Boulevard
Suite 1100
Kansas City, Missouri 64108

For Defendant: MS. REBECCA SCHWARTZ
MR. TODD RUSKAMP
Shook, Hardy & Bacon
2555 Grand Boulevard
Kansas City, Missouri 64108

Denise Catherine Halasey CVR, CCR #1257
US Court Reporter for The Honorable Brian C. Wimes

March 5, 2015

(Proceedings began at 1:50 PM)

THE COURT: Hello, Counsel.

MR. KRONAWITTER: Good afternoon, Your Honor.

THE COURT: I understand I have Mr. Horn, Mr. Kronawitter, and then Ms. Schwartz and Mr. Ruskamp?

MS. SCHWARTZ: That is correct.

THE COURT: Okay. Where do we start? I had the opportunity -- I reviewed my last order, and I think this is a dispute or a discovery dispute that kind of involves the same thing; am I correct?

MR. KRONAWITTER: To some degree, Judge. This is Joe Kronawitter, Judge.

THE COURT: Okay.

MR. KRONAWITTER: To some degree I believe that is correct. I think the easiest place to start it's our discovery requests at issue.

THE COURT: Sure.

MR. KRONAWITTER: There are two interrogatories and a couple doc requests. We can start with the interrogatories if you would like?

THE COURT: Yes. Let's do that.

MR. KRONAWITTER: Okay. All right. The first one in our letter, Your Honor, is interrogatory number eight and it asks for the identification of consumer complaints related

to Ally's GAP policy and GAP contracts. And we're able -- there is an objection, it is overly broad and so on. But we are willing to widdle down the time frame if that is the issue. But we think this is relevant information and we would like to get it.

THE COURT: Ms. Schwartz or Mr. Ruskamp?

MS. SCHWARTZ: Yes, Your Honor, this is Becky Schwartz. I think this as a good of place to start as any.

THE COURT: Sure.

MS. SCHWARTZ: Because the fundamental issues -- almost all of these issues that are before the Court today is the question of whether Ally's own GAP product is actually at issue in this lawsuit?

We know, of course, that based on the complaint, the only GAP contract at issue is one that was marketed by CNA National. And, of course, we know that that contract was attached to a sales agreement which is ultimately financed by Ally. But there are -- I think we talked about on the last time we were on the phone with, Your Honor, hundreds, if not thousands of different providers of such GAP contracts. And while plaintiffs have essentially attempted to make Ally's product relevant, I would say as a matter of convenience. In other words, the notion is that Ally certainly has information about its own product so it could produce that in discovery. The fact is there is really no difference, practical

difference, between Ally's product and all the other hundreds of third-party GAP products. None of which, including Ally's are actually at issue in this lawsuit.

So when this request seeks information about complaints, and specifically it says pursuant to your GAP contracts, meaning Ally's GAP contracts, it is asking about complaints on contracts which are not at issue in this lawsuit.

And so fundamentally we really need to get to the core of whether Ally's product or any other product other than the one that plaintiff actually bought is at issue in this lawsuit, and therefore within the scope of discovery.

THE COURT: I think -- Mr. Kronawitter, I think Ms. Schwartz is exactly right. I think I've got to make that determination. Would you agree with her?

MR. KRONAWITTER: I don't agree with their position. I agree with her that there is an issue that probably should be resolved for purposes of getting discovery moving.

THE COURT: Right.

MR. KRONAWITTER: Certainly.

THE COURT: Right. We wouldn't be on the phone if you agreed with her the way she characterized it, would we? Because you would agree and we would move forward from there. I understand.

She framed the issue as if that's fundamental, as it

relates to CNA and not these hundreds or thousands or whatever other third-party providers. I mean, that's an issue.

MR. KRONAWITTER: Right.

THE COURT: You want that from them, they don't want to give it to you. They don't think it's relevant, you think it's relevant.

MR. KRONAWITTER: That's half of it, Your Honor. You are absolutely right. But they haven't even given us the information for CNA, for the CNA GAP contracts. They haven't even given us consumer complaints on interrogatory number eight for those.

THE COURT: Ms. Schwartz, why is that?

MS. SCHWARTZ: Well, Your Honor -- well, first of all we have the outstanding objection. And, of course, the interrogatory is written with respect -- it refers to your GAP contract. So the interrogatory itself asks for information not about CNA's contract, but about Ally's. And so that's why we lodged the objections, of course.

And as I sit here today, Your Honor, I'm not sure what the scope of may be about CNA GAP products, because, of course, we don't sell that GAP product. And therefore, we wouldn't be the natural recipient of those complaints. We have provided to plaintiff a complete listing of all the GAP CNA, GAP contracts for which there were deficiencies, condition related, you know, adjustments made. So I don't

know whether my client has complaints about the CNA product because that's not what the interrogatory asked for.

THE COURT: Right.

MS. SCHWARTZ: We can certainly look into that, but I would guess as I sit here, essentially the plaintiff knows the range of folks who might have a complaint. We've already provided that in discovery. So I can go back if I need to, but I'm not sure how productive it is ultimately going to be since it is not our product and we may not have it at all.

MR. KRONAWITTER: Judge, they say that it isn't their product, here's the background.

My client took out a car loan, she bought a GAP rider to that financing agreement, that loan document. That loan document was assigned to Ally along with the GAP rider. The finance contract, the loan, was in between Ally and my client. The GAP rider was part of that contract. My client doesn't have a contract with CNA, my client didn't sue CNA, CNA is not mentioned in our complaint, CNA is not mentioned in Ally's answer. This whole CNA argument is -- we've kind of been through this before. I mean, it is a red herring. My client's contract is against Ally. Her claim is Ally breached its contractual agreement to waive GAP. She wrecked her vehicle, her insurance company paid her some money, which went to Ally. Ally then had a balance of about $3000 dollars on her loan. They then offset $400 dollars of that from the CNA

GAP rider, and then sent my client a letter saying, guess what? You still owe us $3000, we want our money. That is what this case is about. It isn't about CNA or any other company. This is about the claim of the contract between the consumer and Ally. Whether that rider was drafted by CNA or some other company, maybe it was, but that doesn't change the nature and the focus of our case. Our case is against Ally, it's not against CNA.

I guess the best example would be if I go into a grocery store and buy a can of Coke and it's defective or they charged too much for it, I sue the grocery store. It's you who charged me for this. The grocery store can't say, well, that's just limited to Coke products if their overcharging for all types of soft drinks. That's what they're doing here. They're saying your contract, part of it was drafted by CNA, therefore, that's the only thing at issue in our lawsuit. And that's just not the case. That's not the way the complaint is framed, and that not the way the underlying facts are.

THE COURT: Well, I thought from my last order that you are going to be provided with an exemplary sample of GAP insurance contracts from others provided to see if they were similar?

MR. KRONAWITTER: That's correct, and they did that. They sent us example contracts, GAP contracts, from other insurance companies. And we're past that point and now we

need to move on to the rest of discovery which is send us your e-mails. Let's see some of the internal memos and issues related to GAP coverage. I mean, we want to start taking depositions. This case has been on file a long time, and I think the next step is getting in to this underlying discovery, such as consumer complaints, internal communications about GAP, things like that.

MS. SCHWARTZ: If I may, Your Honor, referring back to your order, the November 7th order, you did require Ally to produce those other exemplary sample group. Of course, we have produced thousands and were actually accused of dumping them on plaintiff.

And then we made sure we had produced all of the CNA related forms that have been approved for use. But ultimately your order also said that if after reviewing the sample, plaintiff contain that other GAP contracts are similar enough for class certification, the parties shall confer on the scope of discovery.

So it wasn't just supposed to be an exercise in provision.

THE COURT: Right.

MS. SCHWARTZ: It was supposed to be a productive step taken by Ally so that plaintiffs could determine whether other providers, including Ally, are actually within the scope of the complaint.

You know, I invite the Court to go back and look at the complaint because I think it actually is fairly clear what the origins of the damages are. And that is the CNA GAP agreement.

THE COURT: So my question to you, Mr. Kronawitter, I said -- you said, we did that, but you still haven't answered my question that was in the order. Were the GAP contracts similar enough for class certification?

MR. KRONAWITTER: Yes, Judge, we think they are. Yeah. Our claim is breach of contract and we also have the Missouri Merchandising Practice Act Claim. And if you start to go through these contracts, the precise wording may differ from contract to contract, but the underlying point is the same.

These are marketed to people -- well, I'll just read to you from Ally's own marketing material. It says, this GAP contract covers the borrower's responsibility for the GAP between the outstanding finance contract balance, that's the loan, and the actual cash value of the totaled vehicle. That's how it is marketed. You start to read the fine print of these contracts, and that's not the way they read. Ally's contract is marketed that way to people, but it actually reads, if you read the fine print, they deduct the money you get from the insurance company, but you got to add back in your deductible, and wear and tear, and a lot of other things.

So, yeah, we think the contract that they produced to us are similar enough that we are ready to move forward with those in discovery.

MS. SCHWARTZ: Well, Your Honor, I'm not sure if the paraphrasing of Ally's contract is really fair here because there certainly are distinctive differences between the Ally contract, including the very provision related to the condition related adjustments, which was administered in this instance by CNA on their product.

And so you're not just talking about the language of each agreement, which by the way, you do it very dramatically, and we certainly provide the Court examples of dramatically varying contracts within the set that we produced. But more importantly, then there is the whole administration of that agreement. And Ally does not administer those agreements. It does not interpret the consumers claim, and determine how to handle that, and make -- things like the condition related adjustments, which are at issue. That is a function that is carried out by the provider of the GAP product.

And so out of pure practicality we're talking about every different contract being different and every different contract being administered on an individual basis. And that cannot be encompassed within the complaint. She only purchased one company's product. It was not Ally's product, nor any other third-party. It was CNA only. That's the only

one at issue here.

And therefore, the language interpreting the contract and it's administration are what are at issue. And I should add, it is really only that form of that contract because there has been different forms of CNA contract.

MR. HORN: Your Honor, this is Bob Horn for the plaintiff. I've read a number of these contracts. Which essentially what we have here is -- what we have learned from Ally is that they have a process by which they approve or disapprove all of these GAP policies that are provided by this third-party. So we want to know what the basis is. If the contracts are dramatically different as it has been represented, why are some of those approved with the language like CNA? Why are others approved with the language that is different? What does Ally's own policy say? I think all of that is relevant with regards to the discovery of admissible evidence, and that is really what we're looking at here.

As far as the plaintiff and the class, they, you know, they're not shown at the time they take out their loan, here are ten different third-party insurance companies that you can choose that Ally has approved, that you can choose from. Some of them have language that may be better for you. Some of them have language that is worse. Some of them are cheaper, some of them are more expensive. Nothing like that as we understand it. They simply -- whatever relationship

Ally has with the car dealership they push certain GAP policies at any given time. And so that whole process is the approval of Ally of these different policies which have -- some of them do have different language. We believe we are entitled to discover that to show that in essence what has happened here, that while these policies are marketed as GAP policies, and the consumers believe that that is exactly what they do, is that they provide for protection, and the difference between what is your car is worth at the time you total it, and what you still own on your loan. That consumers discover that that is not what is happening here. That in fact, the GAP is not 100 percent covered.

And that is our case and that is what happened here. The CNA policy is very poorly written. There's no doubt about that. But other policies are just as bad. The Ally policy is certainly not clear. The consumers believe that they are getting the entire GAP coverage, and they are not. So we need to do discovery on that and determine how Ally determines how these things are gonna -- Ally has the final say. The insurance company, CNA, or these other insurance companies tell Ally, you know, we're going to pay you $500 or $1,000 dollars or whatever. And then Ally has the final say on telling the consumer who they have the loan with that, hey, you are covered completely by your GAP or you still owe us money. And so Ally is right in the middle of this. This is

not a CNA program, it's an Ally program. And that is why we seek the discovery on this.

MR. RUSKAMP: Your Honor, this is Todd Ruskamp, if I might?

THE COURT: Yes.

MR. RUSKAMP: For Ally. You know, Mr. Horn raises some interesting points about marketing and what the customers believe, but it really does help to illustrate why the objective of your order really has -- of finding out is there really a certification issue here with respect to these hundreds or thousands of other carriers who are financed with the purchase of their contractor's financed on an Ally deal or not. Is there a certification issue here?

You know, when they about the marketing of the product, of course, that's the marketing that goes on in each dealership when each car is bought in a negotiation that happens between what we all probably view as the infamous sales manager and the customer buying the car. And the notion of what the consumer believes at the time that they purchased that product, I mean, those are all very individualized issues and factual questions. And it is going to be difficult, I think, to get a class certified here just on the Ally contract alone, which is what the plaintiff is a party to. But the idea that we should have to produce e-mails and complaints and, you know, all of that ancillary stuff to the extent it

exists or it can be found for thousands of other carriers and hundreds of thousands of other -- of transactions that maybe out there because that is a certifiable class, is really a stretch when the plaintiffs are saying what is important here is how the product was marketed, and what the plaintiff believed they were buying. At least to the extent this plaintiff had a CNA contract and wants to talk about that agreement and folks who were similarly situated, we have produced substantial summary data in spreadsheet form with the hundreds of thousands of customers who were involved there.

And I understand what Mr. Kronawitter is saying about some of the details about complaints and e-mails related to the CNA product. There likely is some additional work we can do there. I don't think there is a bunch of additional complaints or anything, but to then expand that to hundreds of other carriers because of an allegation that these were marketed in a similar way by every dealer around the country and that all the plaintiffs had a similar view, I think is really testing, you know, what Rule 23 was intended for.

And so we think that the discovery should be limited to those CNA related contracts, and those customers, and those complaints, and that sort of thing. And that is what we have made big steps toward. And the November order, when we produced all of that information there wasn't an effort to amend the complaint or to try to make allegations that there

was a certifiable class, you know, with these thousands of agreements that we produced. It's still a complaint that talks about claims based upon this CNA GAP rider that is attached to the complaint.

MR. HORN: And Judge, Bob Horn again. And for purposes of discovery, I mean, I understand Mr. Ruskamp makes it difficult to certify this case based upon the marketing, but the marketing is, best we can tell, the same for everyone that buys a car that is financed by Ally. They provide it on their web page, they provide it on brochures with regards to GAP care coverage. And GAP care coverage is not -- here is the GAP care coverage if you get a CNA policy, he is the one if you get a Safeco policy, here is the one for the Progressive policy. It is marketed as the GAP care policy. It is not distinguish between any particular one. And it makes it very clear that when you finance your car with Ally and get GAP coverage, it will provide for the outstanding difference between the finance contracts and the actual cash value of your vehicle.

So we do believe that the discovery will show that when you buy a car that is financed by Ally, it is the same marketing that is done to every consumer using the same scripts, the same internet, the same brochures. But that is a matter of discovery, and we welcome that challenge to show that.

If, in fact, it turns out that for every consumer and every dealership if you finance with Ally they may tell you one thing, one customer one thing and another customer a different thing depending upon what policy they are selling them from a third-party vendor. But everything we have seen right now is this is a uniform marketing practice by Ally with regards to providing GAP coverage to -- the GAP is for the purpose of really protecting Ally, because Ally has the loan and if your car is totaled, Ally wants to make sure that they get all their money back. And they want to make sure that they get it from CNA, and if there is a deficiency, then from the consumer.

So this is a marketing program by Ally. This is not -- CNA doesn't have anyone at the car dealership telling them about their policy. These are policies approved by Ally to provide GAP coverage to consumers that are financing their cars through Ally with the same marketing, the same brochures, the same Internet. And so that's what discovery is about. If at the end of that we can't certify anything broader than a CNA class, than that is fine. But we should be allowed to determine that based on what we know now, we believe we can do that.

THE COURT: Let me ask, so I'm trying to understand. Is the -- and for example, with this CNA contract is the Ally part of that? Like if we have Safeco on these other





Case 4:13-cv-01151-BCW Document 46 Filed 06/19/15 Page 16 of 32

third-party -- let me rephrase this.

Counsel, Mr. Horn, you had suggested some how that you may have Safeco, CNA?

MR. HORN: Right.

THE COURT: So are you saying they are marketed similarly at the time of financing?

MR. HORN: Yes. Your Honor, I'm saying they are all essentially marketed the same. There is no distinction for the consumer that, you know, here's your choice, we have ten different insurance contracts here, one is by CNA, one is Safeco, one by State Farm, one is by whoever, all which have been approved by Ally for GAP coverage. And here is the difference between these ten policies, some of them cover more, some of them cover less, some of them cheaper, and some are more expensive, and you choose which one you want. That is not what happened.

MS. SCHWARTZ: If I may, Your Honor, the way Mr. Horn is describing this is just completely inaccurate. This approval of certain GAP products by Ally is simply an agreement that if a car is sold and one of these products is sold along with it, and that loan is ultimately transferred to Ally to carry the financing, that somehow that signals a marketing of the product itself. And everything he was reading about the marketing he was reading about the Ally product, which is not the product at issue here.

And more to the point this marketing that occurs at the dealer level is conducted by the dealers. There is no centralized guiding force on the part of Ally with respect to the sales of GAP products to the contrary.

MR. RUSKAMP: They are -- I'm sorry to interrupt.

MS. SCHWARTZ: Yeah, go ahead.

MR. RUSKAMP: Ally is not involved in that process, Your Honor. When this proposed retail sale contract comes to Ally, it comes to Ally with either a GAP contract included or not, with rust proofing included or not, with seat care included or not. Ally looks at it, underwrites it, decides if they are going to finance it, and they get back to the dealer. The one thing that Mr. Horn says is accurate is price does matter. And so these dealers will try to get -- they'll try to up sale these products. And GAP is one of them. We have all been through it. All right. And if they can get that coverage more cheaply one place or another from the providers, like CNA or Safeco.

THE COURT: Right.

MR. RUSKAMP: They're contacting the dealer networks, the Hendricks and the big national dealers trying to offer their product cheaper. And then the dealer network is pushing that product. Ultimately, when Ally gets this paper, that stuff has all been done and either they finance it or not. The only approval aspect of it is is that if they are

doing the underwriting. If they see that there is a contract that is not their contract that has been sold by the dealer but it's one of their approved contracts, they will at least approve that part of the contract for underwriting. They have got to look at all the other parts of it to decide if they want to finance it, they get back to the dealer. But then, of course, the dealer goes to other finance companies as well. And they try to get the best price because they're trying to sell cars. That is what Ally does.

And Becky is right, the stuff that Bob is reading is with respect to the Ally product. But that product, I mean, it has nothing to do with Safeco or CNA or anything like that. And we will literally be chasing across the country interviewing sales managers and sales representatives about how they market it, and how they sold the CNA products and the Safeco products. None of which has anything to do with Ally.

I mean, Ally gets the paper and they either finance it or they don't. It may have a GAP contract, it may not. And they underwrite it based upon whatever that risk is.

MR. HORN: If they have the GAP product it has to be a product that has been approved by Ally or they will not approve that GAP product.

MR. RUSKAMP: That is not true, Bob.

MR. HORN: That is what your interrogatory said.

MR. RUSKAMP: They have, they have preapproved forms

of agreement, but they will consider any sales contract and make a decision about whether or not they will finance it. They only see the paper after that sale has been made by the dealer.

THE COURT: Okay.

MR. RUSKAMP: They then have to make a decision if they are going to finance it.

MR. KRONAWITTER: Well, Todd, I'm looking at your guy's cover letter you sent me when you sent me all these contracts, and you said these come from a database.

MR. RUSKAMP: Yeah.

MR. KRONAWITTER: There submitted for approval and preserved in a database.

MR. RUSKAMP: Joe, it's just like any other underwriting criteria. They'll have ranges, and when they are looking at this or they're looking at rust proofing or all the other stuff that gets those upcharge sales, if it on a preapproved form, they check the box. If it isn't, they have to do a special underwriting to decide if they are going to underwrite it.

And I'm not saying that probably 98 percent of the contracts they get don't involve preapproved agreements, but the idea that Ally is involved in this whole marketing and sales process, that's just not right. They get the contract as it is. They either buy it or they don't. They bid on it

basically.

MR. KRONAWITTER: If I can make a final point here, Your Honor.

THE COURT: All right.

MR. KRONAWITTER: Regardless of what Mr. Ruskamp was just saying there is one thing that they cannot run from, and that is this contract, this loan agreement, is between the consumer and Ally. The GAP coverage is a part of that contract. Now, whether that GAP rider has the word CNA on it or Safeco or some other insurance company name, from our perspective, that doesn't matter. My client didn't buy that from CNA. They have a contract with Ally. Ally is the one that at the end of the day that provides the GAP coverage and sends the consumer a letter like Exhibit 4 that we sent to the Court. Sent them a letter saying you still owe us X. amount of dollars because your GAP coverage wasn't enough. That is what this case is about. The case is about was the GAP waived or was it not waived? And if it was not waived, was it a breach of the contract? That comes from Ally. Ally is the one imposing the loan agreement on consumers and saying you still owe us money even after your GAP coverage is over. It doesn't matter that it has the word CNA on it, she didn't buy this from CNA. Her deal is with Ally.

MS. SCHWARTZ: She didn't buy it from CNA, she financed it ultimately through Ally. She did not buy it from

Ally. Financing and purchasing are two separate things.

MR. KRONAWITTER: Okay. But what we are talking about, again, is how was this contract administered at the end of the day after she had an accident? How was the GAP administered and how is the contract, the loan balance offset? That is what this case is about.

MS. SCHWARTZ: Well, yes, agreed. And in your documents, including those that we produced to you, represent how it was administered which is that it was administered by CNA, it was not administered by Ally.

MR. KRONAWITTER: Well, that's not what CNA says. Judge, we submitted a letter to you with CNA saying, we don't do that. We're just a third-party administer. We administer it the way Ally tells us to. I think that was Exhibit No. 3 of what we sent you, Judge.

MR. HORN: And as we understand it, Judge -- this is Bob Horn. CNA sends the money to Ally. We don't send it to our client or the consumers. They send it to Ally and then Ally says, well, that doesn't cover the loan balance that is left. And then they contact the consumer and say you still owe us money. With the relationship between the consumer and CNA or the consumer and Safeco or the consumer and an Ally GAP policy. There really isn't any. It's a relationship in between the consumer and who they have the loan with, which is Ally.

THE COURT: Okay. Now, let's get back to what the interrogatory is saying. You know, I've heard -- I've had the opportunity to hear you all. So you want first of all interrogatories eight and ten? Let me ask you this, Mr. Kronawitter or Mr. Horn, have you received any of the complaints concerning CNA?

MR. KRONAWITTER: No.

THE COURT: Or you're saying you haven't received that either?

MR. KRONAWITTER: No.

THE COURT: And I think what you are saying, Ms. Schwartz, is because the way the interrogatory was worded, kind of generally, that it wasn't specific?

MS. SCHWARTZ: Well, it relates to -- it says, your GAP contract which is why we objected because, of course, your was referred to Ally. I will say -- we're willing to go back and look at complaints related to the CNA agreements that are in our possession. In fact, we offered that in an e-mail to plaintiff's counsel on Monday. So we'll check for complaints that are within the parameters of our objection. What our objection was really about was trying to look for complaints about Ally's GAP products, which as you've just heard us argue at length, Your Honor.

THE COURT: Yeah.

MS. SCHWARTZ: We believe is not an issue. So we'll

look for complaints related to the CNA agreement if that will advance the ball here. We will do that.

THE COURT: Now, let's talk about production of documents. And I know I haven't decided about interrogatories, but I will before we get off. Mr. Kronawitter?

MR. KRONAWITTER: Yes, Your Honor. There are about six or seven we would like to see. I'll just walk through them. Number one, for example, as for communications between Ally and CNA, and we don't have that. It's hard to imagine that this contract, again, since Ally is the one saying to the consumer you still owe me money. We haven't gotten any.

THE COURT: Ms. Schwartz?

MR. KRONAWITTER: No e-mails.

THE COURT: Ms. Schwartz?

MR. KRONAWITTER: No letter agreements back and forth, nothing like that in terms of communications between Ally and CNA.

THE COURT: Ms. Schwartz?

MR. KRONAWITTER: That's number one.

THE COURT: Ms. Schwartz?

MS. SCHWARTZ: Yes, Your Honor.

THE COURT: Why isn't that relevant?

MS. SCHWARTZ: At this point, Your Honor, Ally has produced spreadsheets with substantial information on all of

the CNA related contracts so.

THE COURT: I didn't ask you that. Did you provide any communications that they requested? Is that what you're suggesting?

MS. SCHWARTZ: We have not, Your Honor, but the reason for that is, again, the fundamental point in all of this. The request asked for communications relating to your GAP contracts.

THE COURT: Let me be clear at where I'm at right now at this point in time, and maybe this is will settle it all and we won't have to go through all of it individually.

I think, at this point I agree with the defense or the defendants in this case. But I do think with respect to CNA, you need to provide everything.

MS. SCHWARTZ: Yes, Your Honor.

THE COURT: I may broaden that, but I think at this point from what I'm hearing -- I just don't know, Counsel, and when I say Counsel, I'm talking to Mr. Horn and Mr. Kronawitter. I understand what you're suggesting, you know, your argument is, well, the contract is between Ally and not with, you know, CNA. I think at this point I agree with the defense with respect to the relevancy. And maybe I have to take a deeper look at this, but I think in the interim, Ms. Schwartz, all those things related -- and Mr. Ruskamp, to CNA, you need to provide.

MR. RUSKAMP: And Your Honor, this is Todd Ruskamp. And that piece of it really has not been the focus of our efforts to try to address this. We will do that. The detail about e-mails and things between CNA and Ally. The real crux of our efforts, and this has been within the context of an effort to mediate, has been the scope whether it goes beyond CNA.

THE COURT: Right, sure.

MR. RUSKAMP: And I think even Mr. Kronawitter and Mr. Horn would agree that is where we have been struggling.

THE COURT: Right.

MR. RUSKAMP: We will absolutely get on this issue of some of these detailed document issues with CNA. And I say that not because we shouldn't have done it before, but just to help you appreciate that where we really had our differences been with respect to other carriers.

THE COURT: And I understand that. You know, we touched on that I think the time we had spoke before. And then, you know, I understand. And that's why I said that in the end instead of going over these individually I think the position of the Court now is to provide discovery. And I do agree with the defense with respect to these other third-party care whether it be Safeco or whoever else, thousands of folks who were out there.

MR. HORN: And Your Honor, this is Bob Horn again.

I would ask you to reconsider. I understand the argument that it may be burdensome to go to these other thousand carriers, I'm not sure there are a thousand carriers, but how many there are, but I would ask you to ask Ally to produce their own GAP policy, their own correspondence and let us do discovery about their own GAP policy. Now, that is within their possession. It is not something they have to go out to other third-parties to get. This is they sell GAP policies just like a GAP CNA policy. And they don't have to go contact other providers for that information. They have that information right now. And I do think that is very relevant with regards to their own GAP policies and how they different from others, if they do. And what programs they have set up with regards to their own policies. That should not be burdensome because it's totally within their control. I would ask you to allow us to do discovery on that also?

THE COURT: To their GAP policies?

MR. HORN: Right. Ally sells their own GAP policies just like CNA does. They have a GAP policy that is prepared by Ally and is under Ally's form, and they sell it to consumers when they buy cars. So when we talk about the Ally's loan agreement, that applies to everyone. But then the GAP policies that are in play here are not only CNA and others, but Ally itself has it's own GAP policy that is sold to consumers as part of the loan agreement.

THE COURT: Ms. Schwartz, Mr. Ruskamp?

MS. SCHWARTZ: Your Honor, that fact that -- this is the same issue still. Ally's GAP product is not any differently situated from Safeco or any of the other thousands of GAP providers. This is the exact same issue we have just been dealing with.

And I would just say that the availability or convenience to Ally being able to access its own business records related to its own product does not make it any more relevant to this particular lawsuit. It's no different than ordering discovery on Safeco or any of these other outside third-parties because they are all situated like Ally, other than those records would not be in the same building. But convenience does not create relevance.

MR. HORN: And Your Honor, I believe that it is clearly relevant how Ally administers not only CNA policies but its own GAP policies. And that clearly it is something that could lead to discovery of admissible evidence. We agree that for now we won't go after all the other policies, but the Ally policy and the CNA policy, I think that is clearly relevant and should be allowed.

THE COURT: Now, is this distinguishable the Ally policy as it relates to CNA? Is that different than the Ally policy? Is that different? Do you understand what I'm saying?

MR. HORN: I think so, Your Honor. I think and maybe just -- when a car is sold and Ally is the company that --

THE COURT: -- finances.

MR. HORN: Finances it eventually, then, you know, the customer is offered GAP coverage. The GAP coverage maybe a CNA policy, it maybe some other policy, it maybe an actual Ally finance, Your Honor.

THE COURT: In this case, what was it? CNA?

MR. HORN: CNA. CNA is the policy. But Ally has their own GAP policy, it could have been an Ally policy.

THE COURT: Okay. Okay. I agree with Ms. Schwartz. I don't think that is relevant. I understand now, and I agree with Ms. Schwartz.

So at this time the Court is of this position with respect to discovery that it relates to CNA. And if it was the CNA GAP policy, and not Ally's, then I don't think it's relevant. At this point in time, I just don't see.

MR. KRONAWITTER: Okay. Well, Judge, as for the outstanding discovery can we set some deadlines on when we are going to this information? The CNA policies have been in place since the beginning. Ally has never even disputed that. And again, like your heard earlier, we don't even have that key information. So we would request a deadline.

THE COURT: Sure. Ms. Schwartz?

MR. RUSKAMP: Judge, this is Todd Ruskamp. And really, Joe, in fairness, we have not been talking about these other details. But I would suggest is we would like, Your Honor, to talk with Ally. We will fairly quickly get to them. Ask them to get this additional information that relates to CNA. And then get back to Mr. Kronawitter as to when we can provide that. And if that's not going to be acceptable, we will try and do it as quickly as we can, obviously, we may have to have another discussion about that. I don't like our chances in that discussion.

THE COURT: Yeah, I don't like them either.

MR. RUSKAMP: And you shouldn't. But I think we can gather information and get it to them quickly.

MR. KRONAWITTER: Judge, I think you should set a deadline for this.

THE COURT: Why don't we do this, I'm going to -- Mr. Ruskamp, I'm going to take you at your word that you all will move as quickly as you can. And don't worry about getting me back on the phone. Mr. Kronawitter, if you believe that it is taken too long, then get me on the phone. I don't have, I don't have a problem with that. I would think that the parties can work it out. And I would think that Ms. Schwartz and Mr. Ruskamp will move just as quickly with respect to their client as they can.

If for some reason, Mr. Kronawitter or Mr. Horn, you

think they are dragging their heels unnecessarily or they are not reasonable on the timeframe, get me on the phone. And I would probably agree with Mr. Ruskamp, I probably wouldn't be overly pleased if it has taken a significant amount of time without some extraordinary circumstances.

So I think that is the way we should approach it.

MR. HORN: We understand, Your Honor. We would like to take depositions and we can't take depositions until we get the documents.

THE COURT: Well, what do you think? 30 days? 10 days? 5 days? I just don't know the volume the request entails. So it's hard for me to say. I just don't know.

MR. HORN: I would think 45 days would be sufficient.

MR. KRONAWITTER: And Judge, some of these request they are finite.

THE COURT: Right.

MR. KRONAWITTER: I mean, your document retention policy, I mean, that is not going to take 45 days to produce. Your policy about administration about the GAP -- some of these may take longer to produce, Your Honor, that's understood, but over all it isn't that hard.

THE COURT: Okay. Let's say April 20th. And if for some reason that's not provided by then, then get me on the phone. That's 45 days. I'm fine with that. And it sounds

like they can get it to you quicker. And obviously if we can get this thing quicker and get moving forward with depositions, that's what we need to. So 45 days, April 20th.

MR. RUSKAMP: Thank you, Your Honor.

THE COURT: Anything else?

MR. HORN: Not from the plaintiffs.

MS. SCHWARTZ: Not from the defense.

THE COURT: Okay. Thank you for getting me on the phone.

MR. HORN: Thank you.

MS. SCHWARTZ: Thank you.

CERTIFICATE

I certify that the foregoing is a correct transcript from the record of the proceedings in the above-entitled matter.

June 19, 2015

/s/ Denise C. Halasey
Denise C. Halasey, CCR, CVR
U.S. Court Reporter